**\*FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————
JASWINDER SINGH, *on behalf of himself* :
*and all those similarly-situated,* :
                                        :
                    Plaintiff,          :
                                        :          Civ. Action No. 16-3044 (FLW)
v.                                      :
                                        :
UBER TECHNOLOGIES INC.,                 :                **OPINION**
                                        :
                    Defendant.          :
———————————————————:

**WOLFSON, District Judge**:

Plaintiff Jaswinder Singh (hereinafter, "Plaintiff") filed this action against Defendant Uber Technologies, Inc. (hereinafter, "Defendant" or "Uber"), alleging that Defendant (i) misclassified him and other similarly situated New Jersey Uber drivers as independent contractors, rather than employees; (ii) failed to pay overtime compensation; and (iii) required drivers to pay for significant business expenses that were incurred for the benefit of Defendant. In the instant matter, Defendant moves to dismiss the complaint and compel arbitration, arguing that Plaintiff is bound by the arbitration clause in the Raiser Software License and Online Services Agreement (hereinafter, the "Raiser Agreement"). For the reasons set forth below, the Court finds that a valid arbitration agreement between the parties exists, and, therefore, Defendant's motion is **GRANTED**.

## 1.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Uber is a technology company that serves as a conduit between riders looking for transportation and drivers seeking riders. Declaration of Michael Colman (dated June 1, 2016) (hereinafter, "Coleman Dec."), ¶ 3. Uber provides this technology through its smartphone

application (hereinafter, the "Uber App") that allows riders and drivers to connect based on their geographic location. Coleman Dec., ¶ 3. Raiser, LLC[1] is a wholly owned subsidiary of Uber, and operates as a technology service provider. Coleman Dec., ¶ 2.

Plaintiff, an Uber driver, registered with the Uber App in order to use its "uberX" platform, which provided him with the option to accept ride requests from prospective passengers and transport them for a fair. Coleman Dec., ¶ 4. In doing so, Plaintiff was required to electronically accept the applicable Raiser Agreement, dated June 21, 2014.[2] Coleman Dec., ¶ 7. When Plaintiff logged on to the Uber App with his unique user name and password, he was given the opportunity to review the Raiser Agreement by clicking a hyperlink to the Raiser Agreement within the Uber App. Coleman Dec., ¶ 11. To advance past the screen with the hyperlink and actively use the Uber App, Plaintiff had to confirm that he had first reviewed and accepted the Raiser Agreement by clicking "YES, I AGREE." After clicking "YES, I AGREE," he was prompted to confirm that he reviewed and accepted the Raiser Agreement for a second time.[3]

Plaintiff was permitted to spend as much time as he found necessary in reviewing the Raiser Agreement on his smartphone or other electronic devices before accepting it. In fact, Plaintiff accepted the Raiser Agreement approximately three months after it was made available for his review. Coleman Dec., ¶ 11. After Plaintiff confirmed his acceptance for a second time

---

[1] Pursuant to the Raiser Agreement, because Plaintiff is not a Pennsylvania or California resident, the Agreement was entered into between Plaintiff and Raiser, LLC.

[2] On November 10, 2014, Uber released a new Raiser Agreement that Plaintiff accepted, through the Uber App, on February 10, 2015. Coleman Dec., ¶ 12.

[3] Although the Raiser Agreement is binding upon Plaintiff and Raiser, LLC, Uber may enforce its provisions, including the agreement to arbitrate disputes, as an affiliate of Raiser LLC. *See* Coleman Dec., ¶ 11, Ex. C, § 14.4.

through the Uber App, the Raiser Agreement was uploaded to Plaintiff's "driver portal," where he could access the Agreement at his own leisure, either online or by printing out a hard copy. Coleman Dec., ¶ 13.

The first page of the Raiser Agreement contains a paragraph, written in large bold and capital text, indicating that a voluntary arbitration agreement (hereinafter, the "Arbitration Provision") is contained therein, and that Plaintiff should review the Raiser Agreement with an attorney, before agreeing to its terms and conditions:

> **IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION. BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.**

Coleman Dec., ¶ 11, Ex. C, at 1. A similar paragraph, also written in large bold and capital text, appears within the text of the arbitration provision itself, stating:

> **WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION. YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS—INCLUDING BUT NOT LIMITED TO AN ATTORNEY— REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

Coleman Dec., ¶ 11, Ex. C, § 15.3.

The Arbitration Provision requires transportation drivers—if they do not opt out—to individually arbitrate all disputes arising out of, or relating to, the Raiser Agreement, or their relationship with Uber, including disputes alleging breach of contract, wage and hour, and compensation claims. Coleman Dec., ¶ 11, Ex. C, § 15.3. The Arbitration Provision, in pertinent part, reads as follows:

> IMPORTANT: This arbitration provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis pursuant to the terms of the Agreement unless you choose to opt out of the arbitration provision. This provision will preclude you from bringing any class, collective, or representative action against the Company or Uber .

Coleman Dec., ¶ 11, Ex. C, § 15.3. It further provides:

> **Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Coleman Dec., ¶ 11, Ex. C, § 15.3(i). The Arbitration Provision also contains a delegation clause, requiring the arbitrator to decide issues of arbitrability:

> Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge.

> Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship .

Coleman Dec., ¶ 11, Ex. C, § 15.3(i). Notably, after Plaintiff confirmed that he had reviewed and accepted the Raiser Agreement, along with the Arbitration Provision, Plaintiff was provided with an additional 30 days to opt-out of the Arbitration Provision:

> **<u>Your Right To Opt Out Of Arbitration</u>**.
>
> **Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (*e.g.*, UPS, Federal Express, etc.), or by hand delivery to** [Raiser's legal department].

Coleman Dec., ¶ 11, Ex. C, § 15.3(viii).

Notwithstanding these aforementioned provisions, Plaintiff filed this suit. Specifically, Plaintiff alleges that Defendant misclassified him and other similarly situated New Jersey Uber drivers as independent contractors, as opposed to employees, failed to pay overtime compensation, and required the drivers to pay for significant business expenses that were incurred for the benefit of Defendant.

In the present matter, Defendant moves to dismiss the complaint and compel arbitration, primarily arguing that Plaintiff has agreed to arbitrate issues of arbitrability, as well as his labor-related claims. However, in an attempt to circumvent the Raiser Agreement's Arbitration Provision, Plaintiff maintains, *inter alia*, that a valid and enforceable Arbitration Provision between the parties does not exist because Plaintiff never received a copy of the Raiser Agreement, and that the Raiser Agreement's Arbitration Provision is in conflict with another provision contained within the Agreement. Alternatively, Plaintiff argues that even if the parties entered into an arbitration agreement, it is unenforceable because the agreement (i) is exempt

from the Federal Arbitration Act (hereinafter, the "FAA"); (ii) violates the National Labor Relations Act (hereinafter, the "NLRA") and other related labor statutes; and (iii) is unconscionable.  Defendant disputes each of these contentions.

## II.   STANDARD OF REVIEW

The FAA "'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate . . . . '" *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir. 1999) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). The FAA was designed by Congress "'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.'" *Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 536-37 (D.N.J. 2013) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). In achieving this end, the FAA provides that contract provisions containing arbitration clauses "shall be binding, allows for the stay of federal court proceedings in any matter referable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate." 9 U.S.C. §§ 2-4. Collectively, "those provisions [of the FAA] 'manifest a liberal policy favoring arbitration agreements.'" *Beery*, 953 F. Supp. 2d at 537 (quoting *Gilmer*, 500 U.S. at 24). In that connection, "'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id.* (*Mercury Constr. Corp.*, 460 U.S. at 24-25).

Although federal law presumptively favors the enforcement of arbitration agreements, when a district court is presented with a motion to compel arbitration, it must affirmatively answer the following two questions before compelling arbitration pursuant to § 4 of the FAA: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at

issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). When performing this inquiry, courts apply "ordinary state-law principles that govern the formation of contracts," *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 160 (3d Cir. 2009) (quotations and citations omitted), and, "when determining whether [a] particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co*, 584 F.3d at 524 (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986)).

Even though threshold issues concerning the arbitration agreement are presumptively reserved for the Court, parties may agree to have these issues decided by an arbitrator through the inclusion of a delegation clause within the arbitration agreement. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.") (citations omitted). These delegation clauses are "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. Accordingly, the delegation provision is severable from the underlying agreement to arbitrate, and if the plaintiff chooses to challenge the delegation provision, it must do so specifically. *Id*. at 72. The aforementioned presumption of arbitrability, however, does not apply to the arbitration agreement's delegation clause. Indeed, the Supreme Court has cautioned that "'[c]ourts should not assume that the parties agreed to arbitrate

arbitrability unless there is clear and unmistakable evidence that they did so.'" *Id*. at 79 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## III.    ANALYSIS

### A.    The Raiser Agreement is Valid

As a threshold matter, Plaintiff contends that "Defendant has failed to provide any evidence showing that [Plaintiff] agreed to arbitrate this or any other dispute." Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss (hereinafter, "Pl's Opp'n"), at 2-3. Plaintiff reasons that "Defendant did not necessarily provide a copy of the arbitration clause . . . to its New Jersey drivers." Pl's Opp'n, at 4. Instead, according to Plaintiff, Uber only provided a hyperlink to the Raiser Agreement containing the Arbitration Provision within the Uber App. Pl's Opp'n, at 4. In other words, Plaintiff posits that, because "providing access to a document is not the same thing as providing a document," Plaintiff cannot be bound to arbitrate any disputes with Uber. Pl's Opp'n, at 4. Plaintiff's argument in this regard has no basis in law.

"In the internet era, when agreements are often maintained, delivered and signed in electronic form, a separate document may be incorporated through a hyperlink . . . . " *Holdbrook Pediatric Dental, LLC v. Pro Computer Serv., LLC*, No. 14-6115, 2015 U.S. Dist. LEXIS 94556, at *11 (D.N.J. July 21, 2015). But, before binding a party to the terms and conditions of a hyperlinked agreement, courts must first look "to whether users were provided with a 'reasonably conspicuous notice of the existence of contract terms' and whether the user registered an 'unambiguous manifestation of assent to these terms.'" *James v. Global Tel*Link Corp.*, No. 13-4989, 2016 U.S. Dist. LEXIS 17099, at *14 (D.N.J. Feb. 11, 2016) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)). Courts must determine whether an online agreement that incorporates a hyperlinked-agreement by reference "generally

provide[s] 'reasonable notice'" such that the terms and conditions of that agreement apply. *ADP, LLC v. Lynch*, No. 16-01111, 2016 U.S. Dist. LEXIS 85636, at *12 (D.N.J. June 30, 2016) (quoting *Holdbrook Pediatric Dental, LLC*, No. 14-6115, 2015 U.S. Dist. LEXIS 94556, at *6). If this condition is met, a party will be bound by the hyperlinked-agreement, even if that party did not review the terms and conditions of the hyperlinked agreement before assenting to them. *Id*. (citing *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829 (S.D.N.Y. 2012)). "[T]o hold otherwise would contravene the well settled principle that '[a] failure to read a contract will not excuse a party who signs it, nor will the party's ignorance of its obligation.'" *Lynch*, 2016 U.S. Dist. LEXIS 85636, at *15 (citing *Paper Express, Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753, 757 (7th Cir. 1992)).

Here, Plaintiff was provided with reasonable notice as to the existence of the terms and conditions of the hyperlinked Raiser Agreement. In order to gain access to the Uber App, Plaintiff was required to review and agree to the hyperlinked Raiser Agreement that was prominently displayed within the Uber App's Terms and Conditions page. Indeed, the top of the Terms and Conditions page bore the following message, in capital lettering: "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." Coleman Dec ¶ 7, Ex. A. On that same page was a hyperlink to the Raiser Agreement, labeled "RAISER Technology Services Agreement December 10 2015." Coleman Dec ¶ 7, Ex. A. Importantly, Plaintiff was not required to scroll down through the page in order to see the hyperlinked Raiser Agreement, nor was it hidden or buried within the Terms and Conditions page. Rather, it was prominently displayed and conspicuously located directly beneath the aforementioned instruction. Coleman Dec ¶ 7, Ex. A. In fact, Plaintiff admitted that he had actual knowledge of the hyperlinked Raiser Agreement, but he chose not to read it: "Uber

provided me with an iPhone . . . . Upon receipt of the iPhone, I accessed the Uber Program, there was a link to a contract but I did not click on that link." Declaration of Jaswinder Singh (dated July 16, 2016), ¶¶ 11-12. Regardless, Plaintiff unambiguously assented to the terms and conditions of the Raiser Agreement by subsequently clicking on the "YES, I AGREE" icon, despite the following message located directly above that icon: "By clicking below, you represent that you have reviewed all the documents above and that you agree to the contract above." Coleman Dec. ¶ 7, Ex. A. After clicking "YES, I AGREE," Plaintiff was prompted to a second screen that encouraged him to read the Raiser Agreement again: "PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS." Coleman Dec. ¶ 7, Ex. B. Plaintiff manifested an intent to be bound to the terms and conditions of the Raiser Agreement for a second time by once again clicking on the "YES, I AGREE" icon. Therefore, the Court finds that Uber's notice as to the Raiser Agreement was sufficient, and Plaintiff is bound by the terms and conditions of the Raiser Agreement, including its Arbitration Provision.

### B.      The Parties have Agreed to Arbitrate[4]

Next, Plaintiff argues that Defendant cannot meet its burden in demonstrating that the parties clearly and unmistakably agreed to be bound by the Arbitration Provision. Pl's Opp'n, at 8, 27. In support, Plaintiff argues that § 15.1's language of the Raiser Agreement conflicts with the language of § 15.3. Pl's Opp'n, at 8, 27. In particular, Plaintiff reasons that § 15.1 provides

---

[4] The Court notes that the Raiser Agreement contains a California choice of law provision. Coleman Dec., ¶ 11, Ex. C, § 15.1 ("The interpretation of this Agreement shall be governed by California law . . . . "). For reasons unbeknownst to the Court, however, the parties' briefs primarily rely on New Jersey law. Since a conflict between California law and New Jersey law does not exist with regard to the contract interpretation and unconscionability arguments that the parties have raised, as further discussed below, the Court will decide the issue applying New Jersey law.

that the parties' disputes are subject to the exclusive jurisdiction of courts in San Francisco, California; Plaintiff argues that, however, § 15.3 confusingly states that the parties' disputes, which would otherwise be "resolved in a court of law," must be "resolved only . . . through final and binding arbitration." Pl's Opp'n, at 8. Plaintiff maintains that the Arbitration Provision is unenforceable because the Raiser Agreement "contains a contradiction on its face regarding who (an arbitrator or a court) will hear disputes between the parties." Pl's Opp'n, at 8. The Court finds Plaintiff's interpretation of §§ 15.1 and 15.3 erroneous.

First, courts that have reviewed the Raiser Agreement's Arbitration Provision rejected identical arguments made by Plaintiff here, reasoning that an ambiguity cannot be created by comparing the language of the arbitration provision to other provisions contained in the Raiser Agreement.  In doing so, those courts relied on the Supreme Court's decision in *Rent-A-Center*, which held that an arbitration provision is severable from the remainder of the contract. *See Sena v. Uber Techs.,* No. 15-2418, 2016 U.S. Dist. LEXIS 47141 (D. Ariz. Apr. 7, 2016); *Varon v. Uber Techs., Inc.*, No. 15-3650, 2016 U.S. Dist. LEXIS 58421 (D. Md., May 3, 2016); *Bruster v. Uber Techs. Inc.*, No. 15-2653, 2016, U.S. Dist. LEXIS 67523 (N.D. Ohio, Aug. 2, 2016). *Suarez v. Uber Techs., Inc.*, No. 16-166, 2016 U.S. Dist. LEXIS 59241 (M.D. Fla., May 4, 2015).  It is the collective opinion of those courts that the analysis of whether an ambiguity exists must be confined to the arbitration provision itself.  Indeed, Plaintiff does not point to, nor does the Court find any, ambiguity within the Arbitration Provision such that the terms would be unenforceable.

Nevertheless, Plaintiff requests this Court to look beyond the four corners of the Arbitration Provision. Clearly, such an approach, which is not solely limited to the language of the arbitration agreement, diverges from the contract analysis applied in the aforementioned

cases. But, even if I were to adopt Plaintiff's approach, the Raiser Agreement is not internally inconsistent.[5]

When reviewing a contract in its entirety, as requested by Plaintiff, "individual provisions must be read in their context and not in a vacuum." *Int'l Ass'n of Machinists & Aero. Workers v. US Airways, Inc.*, 358 F.3d 255, 266 (3d Cir. 2004) (citing *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996)); *New Wrinkle, Inc. v. John L. Armitage & Co.*, 238 F.2d 753, 757 (3d Cir. 1956) ("It is elementary that a written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided."); *Mayer v. Dev. Corp. of Am.*, 541 F. Supp. 828, 857 (D.N.J. 1981) ("'An interpretation which gives effect and meaning to a term is to be preferred over one which makes such term mere surplusage or without effect.'") (quoting *Rossville Salvage Corp. v. S. E. Graham Co.*, 319 F.2d 391 (1963)). Indeed, "[d]isproportionate emphasis upon a word or clause or a single provision does not serve the purpose of interpretation." *Newark Publishers' Ass'n. v. Newark Typographical Union*, 22 N.J. 419, 426 (1956). Put differently, "[w]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole . . . ." *Id.*

Here, in accordance with these basic contract principles, the Court must be mindful to review the Raiser Agreement so as to avoid "interpreting one provision in isolation from others pertaining to the same subject." *Lesage v. JC Penney Co.*, No. A-3154-08T2, 2012 N.J. Super. Unpub. LEXIS 699, at *35 (App.Div. Mar. 30, 2012) (citing *Newark Publishers' Asso.*, 22 N.J. at 426). In doing so, the Court finds that §§ 15.1 and 15.3 are not in conflict. They reflect which types of claims must be arbitrated.

---

[5] In addressing Plaintiff's position, the Court is not deciding whether Plaintiff's approach is appropriate in this context.

Section 15.1 of the Raiser Agreement states, in pertinent part, that "any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California." Section 15.2, displayed directly and conspicuously beneath § 15.1, provides, in pertinent part: "*Other than disputes regarding the intellectual property rights of the parties*, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services may be subject to arbitration pursuant to Section 15.3." Coleman Dec., ¶ 11, Ex. C, § 15.2 (emphasis added). Section 15.3(i) states:

> *Except as it otherwise provides*, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration.  This Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial . . . .

Coleman Dec., ¶ 11, Ex. C, § 15.3(i) (emphasis added). Subsection ii of § 15.3, which is labeled "Limitations On How This Agreement Applies," provides an exclusive list of actions—including intellectually property right claims identified in § 15.2 that are explicitly excluded from the scope of the Raiser Agreement's Arbitration Provision. Plaintiff ignores the language in § 15.2, and instead reads § 15.1 and § 15.3 in a vacuum, divorced from the other provisions in the Agreement. However, these particular sections, i.e., 15.1-15.3, when read as a whole, can be clearly harmonized, and they leave no uncertainty as to which types of claims are subject to arbitration, and what other types can be litigated in court. Indeed, intellectual property right claims, along with the other actions that are explicitly listed in § 15.3(ii), are subject to the exclusive jurisdiction of the courts in San Francisco, California pursuant to § 15.1's forum

selection clause.[6] On the other hand, any other disputes arising from the Raiser Agreement or the parties' relationship are subject to the Raiser Agreement's Arbitration Provision. Stated differently, those actions that are excluded from arbitration, and thus fall outside the scope of the Arbitration Provision, fall within the scope of § 15.1's forum selection clause. Accordingly, contrary to Plaintiff's argument, §§ 15.1 and 15.3 are not inconsistent. Therefore, the Arbitration Provision is enforceable.

### C.    The Parties' Agreement is Subject to the FAA

Third, Plaintiff argues that, even if Plaintiff is bound by the Raiser Agreement's Arbitration Provision, this Court lacks the authority under the FAA to compel arbitration, because the narrow exemption contained within § 1 of the FAA excludes contracts involving "transportation employees." Pl's Opp'n, at 9-13. Plaintiff argues that the FAA exception applies since his job requires him to "transport passengers across state lines . . . ." Pl's Opp'n, at 9. However, this argument presupposes that Plaintiff's status is that of an employee, as opposed to an independent contractor, as Defendant contends.[7] But, even if Plaintiff were an employee, the FAA would necessarily govern the parties' arbitration agreement; Plaintiff's definition of "transportation employees" is overly broad.

Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract"

---

[6] Indeed, if an Uber driver decides to opt-out of arbitration, § 15.3's forum selection clause would apply to limit the jurisdiction in which that driver may file his/her claims.

[7] The resolution of Plaintiff's status as an employee, as opposed to an independent contractor, is dispositive of Plaintiff's labor-related claims on the merits. However, the crux of the parties' dispute, in connection with this motion, rests solely on the issue whether the Raiser Agreement's Arbitration Provision is valid and binding upon Plaintiff. Since the enforceability of the Arbitration Provision does not necessarily depend on Plaintiff's employment status, it is appropriate to reserve that issue for the arbitrator, rather than for this Court.

shall be valid.   9 U.S.C. § 1.   Nevertheless, § 1 of the FAA provides, in pertinent part: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Id.* The scope of § 1's exclusion has been narrowly construed by a large number of circuit courts, including the Third Circuit. *Tenney Eng'g v. United Elec., Radio & Mach. Workers*, 207 F.2d 450, 452 (3d Cir. 1953) (holding that the exclusionary language of § 1 should only apply to those "workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it").

To date, virtually every circuit having considered the issue has found that the FAA's exclusion only applies to those employees who are actually engaged in the movement of goods, as opposed to the transportation of people, in interstate commerce. *See Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600-01 (6th Cir. 1995) (The FAA's exemption should only "apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are"); *see also Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351 (8th Cir. 2005); *Paladino v. Avnet Computer Techs.*, 134 F.3d 1054, 1060-61 (11th Cir. 1998); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997); *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274 (4th Cir. 1997); *Rojas v. TK Communs.*, 87 F.3d 745, 748 (5th Cir. 1996); *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 n.3 (7th Cir. 1995); *Dickstein v. Du Pont*, 443 F.2d 783, 785 (1st Cir. 1971).   Put differently, the circuits have found that an employee's direct involvement with physical goods is a prerequisite to fall within § 1 of the FAA's exemption.

Although the Third Circuit has not ruled on whether the FAA's exemption is only applicable to employees involved in the transportation of physical goods, this Court finds no

reason to diverge from the uniform body of circuit court precedent, particularly because it is in accordance with the Supreme Court's decision in *Circuit City Stores v. Adams*, 532 U.S. 105 (2001). In narrowly interpreting § 1 of the FAA, the Supreme Court applied *ejusdem generis*, a canon of statutory construction, which "limits general terms which follow specific ones to matters similar to those specified." *Gooch v. United States*, 297 U.S. 124, 128 (1936). In doing so, the Supreme Court found that the FAA's exemption "should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Circuit City*, 532 U.S. at 115. The Supreme Court thus held that § 1 of the FAA only exempts a narrow category of workers, like "seamen" and "railroad workers," who are engaged in "*the free flow of goods*." *Id.* at 121 (emphasis added). Such a narrow interpretation, as noted by the Supreme Court, coincides with the intent of Congress: "[i]t is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA [because] it did not wish to unsettle established or developing statutory dispute resolution schemes [pertaining to such workers]." *Id.*[8]

---

[8] Plaintiff contends that the subject matter of the Raiser Agreement falls within the FAA's exemption and cites to the following *pre-Circuit City* decisions: *Amalgamated Ass'n., etc.. v. Pennsylvania Greyhound Lines*, 192 F.2d 310 (3d Cir. 1951) and *Pennsylvania Greyhound Lines, Inc. v. Amalgamated Ass'n., etc.,* 193 F.2d 327 (3d Cir. 1952). While it appears that the Third Circuit in those cases ultimately applied the FAA's exemption to bus drivers, those decisions primarily dealt with the issue whether a collective bargaining agreement constitutes a contract of employment—not whether employees who transport people, as opposed to goods, fall within the scope of the FAA's exclusion. *See Pennsylvania Greyhound Lines*, 192 F.2d at 313 ("There remains to be considered whether the exception of 'contracts of employment of workers engaged in interstate commerce' from the scope of the Act was intended to include collective bargaining agreements."). Those two decisions have also been distinguished by at least two district courts since the Supreme Court's decision in *Circuit City*, a case which underscored the importance of applying the FAA's exception to employees involved in the transportation of *physical goods*: *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483 n.5 (S.D.N.Y. 2008) ("As described by a later court in the Third Circuit, '[i]t appears that the Amalgamated employees were bus drivers; however, the court did not address the issue and did not rely on this fact in its decision[]'" when the court applied the FAA's exemption.) (quoting *Royal Pioneer Paper Box*

The reasoning underscored by the Supreme Court suggests that a car service provider, such as Plaintiff, is too far attenuated from the types of employees to whom the FAA's exclusion is intended to apply. For one, Uber drivers are not subject to any special arbitration legislation, unlike those employed within the seamen and railroad industries. Indeed, prior to Congress's implementation of the FAA, "Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers." *Id.* (citation omitted). And, when the FAA was enacted, "grievance procedures existed for railroad employees under federal law . . . and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent." *Id.* (citation omitted). In contrast, Plaintiff has not cited to any legislation pertaining to the resolution of disputes between those who are working in the personal transportation industry. Therefore, it is reasonable to find that, in the absence of such legislation, Congress intended for the FAA to apply in this context.

Nor was Plaintiff involved in the movement of physical goods in interstate commerce in the same way as seamen or railroad employees. Indeed, "Uber is a technology company that acts as a conduit between individuals looking for transportation, and independent transportation

---

*Mfg. Co. v. United Paper Workers Int'l. Union Local 286*, No. 96-310, 1997 U.S. Dist. LEXIS 8027, at *2 (E.D. Pa. June 5, 1997)). Furthermore, since *Circuit City*, it appears that courts have unanimously defined "transportation workers" as those involved in the movement of physical goods: *Kowalewski*, F. Supp. 2d at 484 ("The Court thus finds the involvement of physical goods to be an indispensable element to being engaged in commerce in the same way that seamen and railroad workers are." (internal citation and quotations omitted)); *Tran v. Texan Lincoln Mercury, Inc.*, No. H-07-1815, 2007 U.S. Dist. LEXIS 63725, at *14 (S.D. Tex. Aug. 29, 2007) ("[A] transportation worker is someone who works in the transportation industry—an industry whose mission it is to move goods."); *Pelayo v. Platinum Limousine Servs.*, No. 15-00023, 2015 U.S. Dist. LEXIS 173580, at *35 n.6 (D. Haw. Dec. 30, 2015) (holding that plaintiff limousine drivers were not exempt from the FAA, because they were not "engaged in the movement of goods in interstate commerce"). Based on *Circuit City*, and the overwhelming weight of authority interpreting *Circuit City*, in addition to the lack of any analysis related to the definition of "transportation workers" in *Amalgamated*, I find that the FAA's exemption is not applicable in this case because Plaintiff was not involved in the interstate transportation of goods.

providers looking for riders." Coleman Dec., ¶ 3. More specifically, through the Uber App, riders in need of transportation have the option of accessing three different transportation platforms provided by Uber. Coleman Dec., ¶ 12. These platforms include "UberBLACK, UberSUV, and uberX." Coleman Dec., ¶ 4. The UberBLACK platform connects riders to "limousines or town cars operated by transportation companies," while the UberSUV and uberX platforms connect riders to "luxury sport utility vehicles operated by transportation companies," and "vehicles operated by private individuals," respectively. Coleman Dec., ¶ 4. Therefore, Uber's business model is primarily concerned with the transportation of people, and not goods, from one location to another. Accordingly, Plaintiff, who is an Uber driver and has registered to access the uberX platform, does not fall within the FAA's exemption. To hold otherwise would expand the FAA's exemption to include transportation employees such as Plaintiff, a result that "would be contrary to the prevailing 21st century judicial attitude toward arbitration." *Kowalewski*, 590 F. Supp. 2d at 485.

### D.   The Agreement's Class Waiver Does Not Violate the FAA

Fourth, Plaintiff argues that the Raiser Agreement's Arbitration Provision is "unenforceable because it contains a class waiver, which violates [Plaintiff's] substantive rights under several [labor] statutes," including the NLRA. Pl's Opp'n, at 16. Specifically, Plaintiff contends that § 7 of the NLRA provides employees with the right to engage in "concerted activities," which has been defined to include an employee's filing of a class action on behalf of other similarly situated individuals, while § 8 of the NLRA enforces an employee's rights under § 7. Pl's Opp'n, at 17-19. Plaintiff then points to the language of the Arbitration Agreement, which "provides that all disputes must be resolved 'on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.'" Pl's Opp'n, at 19.

Plaintiff reasons that, "since the Arbitration Agreement's class waiver clearly prohibits Singh from pursuing a class action, which constitutes concerted activity under § 7, the class waiver violates § 8 of the NLRA and is unlawful." Pl's Opp'n, at 19. However, this argument also presumes that Plaintiff's status is that of an employee, as opposed to that of an independent contractor. I have already explained that issue need not be resolved on this motion. However, even if Plaintiff was employed by Uber, he would still be subject to the Raiser Agreement's Arbitration Provision, because his argument ignores the Agreement's opt-out clause.

Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. While "concerted activities" are not defined by the NLRA, it has been held to include "resort to administrative and judicial forums . . . . " *Eastex, Inc. v. NLRB*, 437 U.S. 556, 566 (1978). And, some courts have interpreted this to protect collective-suit filings: "[A] lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment is 'concerted activity' under § 7 of the [NLRA]." *Brady v. Nat'l Football League*, 644 F.3d 661, 673 (8th Cir. 2011).[9] Furthermore, an employee's rights under § 7 of the NLRA are enforced by § 8 of the Act, which

---

[9] While there is some support for such an interpretation, another court, relying on the statutory canon of *ejusdem generis*, has held: "Under the *ejusdem generis* canon, the term 'other concerted activities' thus must be interpreted to mean other concerted activities of a similar type as the three enumerated activities. That would include, for example, such collective employee actions as picketing or organizing boycotts . . . . It would not, however, include an employee's ability to bring a class-action lawsuit . . . . " *Bekele v. Lyft, Inc.*, No. 15-11650, 2016 U.S. Dist. LEXIS 104921, at *59-60 (D. Mass. Aug. 9, 2016) (internal quotation omitted). However, this Court need not determine whether the right to engage in "concerted activates" includes the filing of a class action suit, due to the Arbitration Agreement's opt-out clause. *See infra*.

mandates that it "shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." 29 U.S.C. § 158(a)(1).

Nonetheless, the circuits are split on whether an employee may enter into an arbitration agreement requiring the resolution of labor disputes on an individual basis. Indeed, a majority of the circuits that were presented with this issue have upheld such arbitration agreements by finding that the right to engage in a class action lawsuit is procedural, and thus waivable. *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 n.6 (2d Cir. 2013) ("We have previously explained that the procedural 'right' to proceed collectively [under the NLRA] presupposes, and does not create, a non-waivable, substantive right to bring such a claim.") (internal citation omitted); *Cellular Sales of Mo., LLC v. NLRB*, 824 F.3d 772, 776 (8th Cir. 2013) ("[W]e conclude that [the defendant] did not violate section 8(a)(1) [of the NLRA] by requiring its employees to enter into an arbitration agreement that included a waiver of class or collective actions in all forums to resolve employment-related disputes."); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 361 (5th Cir. 2015) ("We know that the right to proceed collectively cannot protect vindication of employees' statutory rights . . . because a substantive right to proceed collectively has been foreclosed by prior [Supreme Court] decisions.").

In contrast, other circuits have found that an employer cannot require an employee to arbitrate disputes on an individual basis, because the right to engage in a class-action lawsuit, pursuant to § 7 of the NLRA, is substantive, and thus incapable of being waived. *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1160 (7th Cir. 2016) ("That Section 7's rights are 'substantive' is plain from the structure of the NLRA: Section 7 is the NLRA's *only* substantive provision. Every other provision of the statute serves to enforce the rights Section 7 protects."(emphasis in original)); *Morris v. Ernst & Young, LLP*, 834 F.3d 975, 986 (9th Cir. 2016) ("The rights

established in *§ 7 of the NLRA*—including the right of employees to pursue legal claims together—are substantive. They are the central, fundamental protections of the Act, so the FAA does not mandate the enforcement of a contract that alleges their waiver."). Accordingly, the circuits disagree as to whether an arbitration agreement, which prevents an employee from filing or participating in a class action lawsuit, is enforceable.[10]

The Court, however, need not reach that issue, because arbitration under the Raiser Agreement is optional. As previously stated, § 8(a)(1) prevents an employer from "*interfere[ing]* with, *restrain[ing]*, or *coerc[ing]* employees in the exercise of the rights" that are granted to employees by § 7 of the NLRA. 29 U.S.C. § 158(a)(1). (emphasis added). In the instant matter, Uber did not partake in any such conduct; in contrast to the cases described above, Plaintiff was presented with the choice of resolving disputes by arbitration or litigation. Indeed, the Raiser Agreement's Arbitration Provision contained an opt-out clause, which was valid for a period of 30 days. This was clearly set forth in a conspicuous section of the Arbitration Provision, boldly labeled "**Your Right To Opt Out Of Arbitration**:"

> **Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision . . . . Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration**

---

[10] The Supreme Court in *Glimer*, albeit in a different context, held that arbitration provisions that require a claimant to individually arbitrate claims under the Age Discrimination in Employment Act, another labor related statute, are enforceable under that Act. *Gilmer*, 500 U.S. at 30-32. However, on January 13, 2017, while this motion was pending, the Supreme Court granted certiorari, in three circuit court cases, on the issue whether despite the NLRA, arbitration agreements requiring employees to waive their rights to pursue class or collective action employment-related claims against their employers are enforceable pursuant to the FAA. *See Epic Sys. Corp. v. Lewis, Jacob*, 823 F.3d 1147 (7th Cir. 2016); *Ernst & Young v. Morris, Stephen*, 2016 U.S. App. LEXIS 15638 (9th Cir. 2016); *NLRB v. Murphy Oil USA Inc.*, 808 F.3d 1013 (5th Cir. 2015).

> **Provision. You have the right to consult with counsel of your choice concerning this Arbitration Provision.**

Coleman Dec., ¶ 11, Ex. C, § 15.3(viii). Importantly, that same provision indicated that an employee's decision to op-out of arbitration would not have any adverse consequences: "**You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision**." Coleman Dec., ¶ 11, Ex. C, § 15.3(viii). Accordingly, the arbitration clause was voluntary, and the Plaintiff's decision to opt-out would not alter the parties' relationship. Such a provision can hardly be construed to interfere with, restrain, or coerce an employee into forfeiting the rights afforded by § 7 of the NLRA. To the contrary, Plaintiff was presented with the choice of either arbitrating his claims on an individual basis, or litigating them, either individually or collectively. Therefore, the Raiser Agreement's Arbitration Provision, which is voluntary in nature, does not violate § 8 of the NLRA.[11] *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1075-76 (9th Cir. 2014) (holding that an arbitration agreement did not violate the NLRA, as "there [was no] basis for concluding that [the defendant employer] interfered with or restrained [the plaintiff employee] in the exercise of her right to file a class action. If she wanted to retain that right, nothing stopped

---

[11] Plaintiff similarly argues that the Arbitration Provision's class waiver is in violation of the Norris-LaGuardia Act and the New Jersey Wage and Hour Law ("NJWHL"). Pl's Opp'n, at 20-21. Without discussing the specifics of the Norris-LaGuardia Act, because the Arbitration Provision contains an opt-out clause, for the same reason it does not violate the NLRA, it does not violate the Norris-LaGuardia Act. *Johnmohammadi*, 755 F.3d at 1077 ("Having freely elected to arbitrate employment-related disputes on an individual basis, without interference from [Defendant], [Plaintiff] cannot claim that enforcement of the agreement violates . . . the Norris-LaGuardia Act."). Moreover, Plaintiff's contention that the NJWHL provides an unwaivable substantive right to bring a class action is baseless. To date, no state or federal court has endorsed such a position, and tellingly, Plaintiff has not cited to any authority for support. Indeed, the Third Circuit in *Vilches v. Travelers Cos.*, 413 F. App'x. 487, 494 (3d Cir. 2011) has found that a provision prohibiting arbitration on a class basis concerning NJWHL claims may be enforceable.

her from opting out of the arbitration agreement"); *Bruster v. Uber Techs. Inc.*, 15-2653, 2016 U.S. Dist. LEXIS 101312, at *5 (N.D. Ohio Aug. 2, 2016) (Distinguishing *Lewis,* and concluding that the Arbitration Provision's prohibition against collective and class actions did not violate the NLRA, because the "[p]laintiff could have easily opted out of the challenged arbitration provisions").

### E.   The Arbitration Provision is not Unconscionable

Lastly, Plaintiff contends that the Arbitration Agreement is unconscionable and cannot be enforced. Pl's Opp'n, at 27. In support of this contention, Plaintiff primarily attacks the Arbitration Provision on two separate grounds. First, Plaintiff takes issue with the parties' purported grossly unequal bargaining power. Pl's Opp'n, at 28. Plaintiff maintains that Uber capitalized on this imbalance by providing him with "a standardized mass contract," without the opportunity to bargain for, or negotiate any of its terms, thereby making it a contract of adhesion, despite its opt-out provision.[12] Pl's Opp'n, at 28-29. Second, Plaintiff points to the language of the Arbitration Provision's cost-sharing provision, which "requires [Plaintiff] to pay for half the costs of arbitration," and posits that this cost-sharing provision renders the Arbitration Provision unconscionable because it prevents him from vindicating his statutory rights. Pl's Opp'n, at 29. However, the Court finds both of these arguments meritless.

A contract in New Jersey will be enforceable unless there are indicia of both procedural and substantive unconscionability. "Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine

---

[12] Having argued that the Arbitration Agreement is a contract of adhesion, Plaintiff maintains that the Court "must . . . determine as a matter of public policy whether to enforce the unilaterally-fixed terms of the" contract. *Rudbart v. N. Jersey Dist. Water Supply Com*, 127 N.J. 344, 354 (1992). However, such an analysis is not necessary, because the Raiser Agreement is not a contract of adhesion. *See*, *infra*.

print and convoluted or unclear language." *Harris*, 183 F.3d at 181 (citation omitted). This element of the unconscionability analysis may be satisfied if the agreement constitutes a contract of adhesion. *Delta Funding Corp. v. Harris*, 189 N.J. 28, 39 (2006). Such agreements are typically prepared by a party with excessive bargaining power, and signed by a weaker party on a "take-it-or-leave-it" basis. *Id.* at 40 (citation omitted).

However, a disparity in bargaining power alone will not render an agreement unconscionable. *Gilmer*, 500 U.S. at 43. The party challenging the agreement must also establish that it is substantively unconscionable. *Seus v. John Nuveen & Co.,* 146 F.3d 175, 185 (3d Cir. 1998). "This element refers to terms that unreasonably favor one party to which the disfavored party does not truly assent." *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003) (citation omitted). Indeed, "[g]ross inequality of bargaining power, together with terms unreasonably favorable to the stronger party . . . may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." *Id.* (citation omitted). Thus, unconscionability "requires a two-fold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Harris*, 183 F.3d at 181 (internal citations and quotations omitted).

Here, the agreement between the parties was not a contract of adhesion. Plaintiff contends that "[t]here was and is absolutely no ability for [Uber drivers] to bargain or negotiate the terms [of the Raiser Agreement] with Defendant." Pl's Opp'n, at 29. However, this assertion is baseless, as Plaintiff was presented with the choice of either arbitrating or litigating his disputes against Uber. Indeed, arbitration between the parties is not required; Plaintiff was afforded a 30-day period to opt-out. Nor was Plaintiff coerced or pressured into accepting

arbitration as a means of resolving his claims with Uber. Accordingly, Plaintiff was free to decline the Raiser Agreement's Arbitration Provision—without any consequences. Therefore, the contract between the parties cannot be construed as a contract of adhesion. *Sena,* 2016 U.S. Dist. LEXIS 47141, at *16 ("[T]he conspicuous opt-out provision and its accompanying language undermine [the plaintiff's] argument that the Arbitration Provision and Delegation Clause were contracts of adhesion."); *Varon,* 2016 U.S. Dist. LEXIS 58421, at *12 ("This Arbitration Provision, with a clearly-stated opportunity to opt-out without retaliation, is not procedurally unconscionable.") (internal citation omitted); *Suarez*, 2016 U.S. Dist. LEXIS 59241, at *12 ("As [Uber] points out, there is no procedural unconscionability because Plaintiffs had the absolute right to opt out of the Arbitration Provision."); *f*, U.S. Dist. LEXIS 67523, at *13 ("The delegation provision is not procedurally unconscionable . . . . [T]he terms of the June 2014 Agreement allow Plaintiff to opt out of the delegation provision without any consequences or changes in the parties' employment relationship.").

Furthermore, the Arbitration Provision's cost-sharing provision is not substantively unconscionable. "[W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). The Raiser Agreement's Arbitration Provision contains a cost-sharing provision:

> In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law.

Coleman Dec., ¶ 11, Ex. C, § 15.3(vi). Significantly, Plaintiff does not adequately allege any facts indicating that the arbitration fees would be prohibitively expensive. Rather, Plaintiff merely summarizes the terms of the cost-sharing provision and then asserts, in a conclusory

fashion, that "the cost-sharing language precludes [Plaintiff] from vindicating his statutory rights." Pl's Opp'n, at 30. Therefore, Plaintiff does not establish a likelihood of incurring prohibitively expensive costs, and there can be no finding of substantive unconscionability based on this reason.[13] *Sena,* 2016 U.S. Dist. LEXIS 47141, at *21 (enforcing the Raiser Agreements' cost-sharing provision because the plaintiff did not "produce[] evidence that his cost to individually arbitrate questions of arbitrability would be prohibitively expensive"); *Varon*, 2016 U.S. Dist. LEXIS 58421, at *12 (same); *Suarez*, 2016 U.S. Dist. LEXIS 59241, at *13-14 (same); *Bruster*, U.S. Dist. LEXIS 67523, at *13 (same).

In conclusion, the Court finds that the parties entered into a valid and enforceable arbitration agreement, and Plaintiff must arbitrate his claims. Typically, having made such a finding, this Court would proceed to the second step of the arbitration analysis under the FAA to determine whether the parties' disputes fall within the scope of the Agreement. However, because the parties have agreed to permit the arbitrator to decide issues of arbitrability under the Agreement's delegation clause, that determination shall be reserved for the arbitrator. Coleman Dec., ¶ 11, Ex. C, § 15.3(i). *See*, *supra*, p. 6-7, *Rent-A-Center*, 561 U.S. at 68-69.

---

[13] Notably, Plaintiff will likely not incur any traveling expenses in connection with the arbitration proceeding. Pursuant to § 15.3(iii) of the agreement, "[t]he location of the arbitration proceedings shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise."  Coleman Dec., ¶ 11, Ex. C, § 15.3(iii). Based on that provision, Plaintiff may arbitrate his claims locally.

**IV.     DISMISSAL OF THE PROCEEDINGS**

Upon an order compelling arbitration, Defendant asks the Court to dismiss the action, and Plaintiff has not requested a stay pending arbitration.  The Third Circuit has held that the plain language of § 3 of the FAA "affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."  *Lloyd v. Hovensa, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004).  Because neither party requests a stay of the proceedings, the Court dismisses the case in favor of arbitration.

Date: January 30, 2017                                          /s/ Freda L. Wolfson
                                                                Hon. Freda L. Wolfson
                                                                United States District Judge